## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFF L. WILLIS, | ) | |
| | ) | No. 12 CV 6417 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | March 18, 2014 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Jeff Willis seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, based on his claim that he is unable to work because of orthopedic problems related to leg, hip, and wrist fractures. After his application was denied in a final decision by the Commissioner of the Social Security Administration, Willis filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are Willis's motion for summary judgment seeking reversal of the Commissioner's decision and the Commissioner's cross-motion for summary judgment. For the following reasons, Willis's motion is granted to the extent that the case is remanded for further proceedings and the Commissioner's motion is denied:

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

## Procedural History

Willis applied for DIB on December 14, 2006, claiming that he became unable to work as of September 20, 2005. (Administrative Record ("A.R.") 151.) After his claims were denied initially and upon reconsideration, (id. at 65, 76), Willis sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 85-86). A hearing was held on March 11, 2009, and a supplemental hearing was held on September 17, 2009, to allow for additional vocational testimony. (Id. at 19.) The ALJ issued a partially favorable decision on January 15, 2010, finding that Willis was not disabled within the meaning of the Social Security Act prior to January 31, 2009, but became disabled on that date and continued to be disabled through the date of her decision. (Id. at 20.) When the Appeals Council denied Willis's request for review, (id. at 1), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On August 14, 2012, Willis filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Willis, who is currently 55 years old, received disability benefits from 1987 to 1997 because a motorcycle accident, which caused multiple fractures in his right leg and leg length disparity, rendered him disabled. After being disabled for 10 years, Willis resumed work from 1997 until 2005. Willis claims he has been disabled since September 2005 when he fell and fractured his right hip and wrist while working as

a truck driver.  According to Willis, he is unable to work now because of limited motion and reduced grip strength in his right hand, as well as pain in his right leg, wrist, and hip.  Willis presented both documentary and testimonial evidence in support of his claim.

## A.  Medical Evidence

The relevant medical record begins in September 2005 when Willis was treated at Morris Hospital for right wrist and right hip fractures after falling from his truck at work.  (A.R. 334.)  Attending physician Dr. Joseph Chung and Dr. Kevin Draxinger performed surgical closed reduction and pinning of his right hip.  (Id. at 353-54.)  They also performed a non-operative closed reduction of his right wrist and placed his right hand, wrist, and forearm in a cast.  (Id. at 338.)  Willis "did very well postoperatively" and was discharged with instructions to take Motrin and Vicodin.  (Id. at 334, 338.)

During a follow-up visit to Morris Hospital in November 2005, Willis reported suffering from a lot of pain.  (Id. at 403.)  Dr. Draxinger noted that his hip x-rays showed no change, but his wrist x-rays showed complete displacement of the distal fragment.  (Id.)  Dr. Draxinger referred Willis to Dr. Eric Ortinau, an orthopedic surgeon affiliated with Morris Hospital, to determine whether a corrective procedure was necessary.  (Id.)  Dr. Ortinau determined that Willis's wrist fracture failed to heal properly, so Willis underwent surgery in November 2005 to apply a plate and screws to his wrist.  (Id. at 361-62.)

From December 2005 through early 2006, Willis's records show that his fractures continued to heal gradually with physical and occupational therapy. (See id. at 384-85, 393.) In March and April 2006, Willis's physical and occupational therapists recommended that he be transferred to a work hardening program. (Id. at 443-44.) In a July 2006 visit with Dr. Ortinau, Willis reported "no problems with his wrist" and an x-ray showed "a completely healed fracture in good position." (Id. at 380.) But Willis complained of pain in his right hip and Dr. Ortinau observed that Willis walked with a cane. (Id.) X-rays showed the hip fracture had healed and that his screws were well placed, but seemed to be "a little bit prominent outside [the] lateral cortex of the hip." (Id.)

Willis underwent surgery in September 2006 for screw removal in an attempt to alleviate his hip pain. (Id. at 416.) In October 2006, Dr. Ortinau discontinued Willis's crutches and allowed him to be weight-bearing "as tolerated." (Id. at 374.) Dr. Ortinau noted that Willis had a shoe lift which equalized his leg length disparity. (Id.) The following month Willis participated in a two-week work hardening program, (id. at 436), after which Dr. Ortinau reported that Willis was "[d]oing well in all regards" and recommended that he be able to work full-time without restrictions, (id. at 371).

Dr. Richard Bilinsky, a state agency medical consultant, conducted a physical residual functional capacity ("RFC") assessment of Willis in January 2007 in connection with Willis's application for DIB. Dr. Bilinsky listed fracture of the right hip as the primary diagnosis and fracture of the right wrist as the secondary

diagnosis. (Id. at 487.) Based on his review of Willis's medical records, Dr. Bilinsky concluded that Willis could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for six hours a day, sit about six hours a day, and perform unlimited pushing and pulling. (Id. at 488.) He found no evidence of postural, manipulative, visual, communicative, or environmental limitations. (Id. at 489-91.)

In May 2007, Dr. ChukwuEmeka Ezike conducted a 30-minute consultative examination of Willis for the Bureau of Disability Determination Services. (Id. at 495.) Dr. Ezike reported that Willis "seemed reliable" and that he complained of "constant right leg pain and difficulty walking." (Id.) Willis stated that his leg pain got worse with "prolonged standing and walking," but that he could walk two blocks, stand for 30 minutes at a time, lift up to 30 pounds, and drive and shop independently. (Id. at 495, 496.) Dr. Ezike made note of Willis's prior trauma in 1987 and the resulting leg length disparity. (Id. at 495.) Willis reported no difficulty with sitting and had normal hip range of motion. (Id. at 496-97.) But his gait was antalgic without the use of assistive devices, and he was unable to perform a "toe/heel walk." (Id. at 497.) Dr. Ezike observed that Willis was able to get on and off the exam table without difficulty and walk more than 50 feet without support. (Id.)

As for his wrist, Willis reported that he had "occasional right wrist pain with decreased grip strength," and he "drop[ped] objects occasionally from the right hand." (Id. at 495.) Dr. Ezike's notes convey that Willis's right wrist extension was 30 degrees and flexion was about 50 degrees, and his right hand grip was 4/5. (Id.

497.)  Willis had a "normal ability to grasp and manipulate objects," could pick up a coin, and could fully extend his hands, make fists, and appose his fingers.  (Id.)  Dr. Ezike's impressions included chronic right leg pain, chronic right wrist pain, history of right leg and right wrist fracture, and hypertension.  (Id. at 498.)

Dr. Frank Norbury, another state agency medical consultant, completed a second physical RFC assessment in July 2007.  He listed traumatic arthritis of the ankle and foot as the primary diagnosis and traumatic arthritis of the hip and wrist as the secondary diagnosis.  (Id. at 502.)  Based on his review of Willis's medical records, Dr. Norbury concluded that Willis could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk at least two hours a day, sit about six hours a day, and perform unlimited pushing and pulling.  (Id. at 503.)  Dr. Norbury also determined that Willis could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes, or scaffolds.  (Id. at 504.)  He concluded that Willis could perform unlimited reaching, handling, and feeling, but could not finger constantly due to his right wrist fracture and reduced grip strength.  (Id. at 505.)  He noted that Willis should avoid concentrated exposure to extreme cold, wetness, and hazards given his traumatic ankle, hip, and wrist arthritis.  (Id. at 505-06.)

Dr. Norbury's additional comments recognized Willis's past trauma and that x-rays showed moderate degenerative changes in his left ankle joint, extensive degenerative changes in his posterior hindfoot, as well as probable disuse

osteoporosis.  (Id. at 509.)  He also briefly summarized the findings from Dr. Ezike's consultative examination report.  (Id.)

## B.    Willis's Hearing Testimony

During the hearing before the ALJ on March 11, 2009, Willis testified that he was 50 years old at the time of the hearing, unmarried, had a high school education, and lived with his parents.  (A.R. 518-20.)  As for his work history, after the 1987 motorcycle accident, Willis was disabled from 1987 until 1997 when he returned to work as a truck driver.  (Id. at 530.)  He stopped working after his fall in September 2005 and has been unemployed since.  (Id. at 521.)  Willis testified that although Dr. Ortinau cleared him for work in December 2006, he did not return to his previous job as a truck driver because he "barely handled [the job] before the accident" due to his older injuries, and because the job involved "a lot of climbing." (Id. at 52.)  He further explained that pain in his right leg made driving for eight or more hours difficult.  (Id. at 544.)  Willis received workers' compensation benefits starting 10 months after the September 2005 accident until December 2006, coinciding with when Dr. Ortinau said Willis could return to work.  (Id. at 527-28.)

Willis also described the limiting effects of his wrist, hip, and leg injuries.  He testified that he has pain in his right hand "mostly all the time," (id. at 545), and that sometimes he has "shooting pain" in his right wrist or his fingers "go numb," (id. at 529).  He said he can only pick up about half the weight he used to, and that he also has trouble picking up small items.  (Id. at 529.)  He stated that his pain increases the more he uses his right hand and wrist, and after approximately 30

minutes to an hour, he has to stop using them. (Id.) He explained that he has decreased grip strength in his right hand and limited range of motion in his right wrist. (Id. at 523.) As a result, everything he used to do with his right hand he now does with his left hand, including opening doors and carrying things. (Id. at 523-24.)

He further testified that he experiences pain in his right ankle and wears a shoe with a one-and-a-quarter-inch lift because his right leg is shorter than his left. (Id. at 532.) This causes him back pain because he walks with a limp. (Id. at 533.) He said he goes up stairs one step at a time and walks at a slower pace. (Id.) Staying off his right leg helps relieve the pain, but he testified that "nothing really helps." (Id. at 544.)

He explained that he is not seeing any doctors aside from Dr. Chung, his primary care physician, because he does not have insurance. (Id. at 534-35.) He would like to go to a pain management clinic because he experiences pain "all the time." (Id. at 534.) On most days he would describe his pain as a two or three on a scale from one to ten, and up to seven or eight if he walks or stands often. (Id.) He takes medication for high blood pressure, (id. at 528), and over-the-counter medications like Tylenol and ibuprofen for his pain, (id. at 534). Willis has been prescribed Vicodin in the past, but said he stopped taking it because he could no longer see Dr. Chung to get a prescription due to lack of insurance. (See id. at 535.)

With respect to daily activities, Willis testified that he drives once or twice a week. (Id. at 520.) He helps out with household chores such as washing dishes and

doing laundry once in a while, but he does not think he could do chores all the time. (Id. at 525.) He is able to drive to the grocery store, and he stated that walking around the store was probably the longest distance he had recently walked. (Id.) He also made a trip to the post office to get stamps and mail letters the week before the hearing, and said that he goes out to eat occasionally. (Id. at 526.)

## C.     Vocational Expert Testimony

At the March 2009 hearing, vocational expert ("VE") William Schweihs answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 517.) However, the ALJ did not ultimately rely on Schweihs's testimony because she learned after the hearing that his conclusions conflicted with the Dictionary of Occupational Titles ("DOT"). (Id. at 19, 311.) As a result, the ALJ held a supplemental hearing with another VE in September 2009. (Id. at 141.)

Prior to the second hearing, Willis submitted a report from VE James Breen concluding that there is no substantial gainful activity ("SGA") matching Willis's vocational profile because sedentary occupations require frequent use of both upper extremities, and limiting a claimant to occasional use of either extremity would "seriously erode (i.e., essentially eliminate) the sedentary occupational base" as defined by the DOT. (Id. at 316, 318.) But by the time she received Breen's report, the ALJ had already determined that the RFC limitations on which Breen based his analysis were not supported by the record. (Id. at 29.) Accordingly, she concluded that neither Schweihs's nor Breen's testimony was relevant to her decision. (Id.)

9

Over Willis's objection, the ALJ held a second hearing in September 2009 with another VE, Grace Gianforte. Gianforte first confirmed that Willis's previous job as a truck driver is a semi-skilled position at the medium range of physical exertion. (Id. at 47.) The ALJ then asked Gianforte about a hypothetical individual of Willis's age, education, and work experience, who was limited to lifting a maximum of 10 pounds with occasional lifting of lighter items, standing and walking two hours total in an eight-hour day, and frequent fingering with the right non-dominant hand. (Id. at 48.) This hypothetical individual could sit for at least six hours a day and stoop occasionally, but could not climb ladders, ropes, or scaffolds, kneel, crouch, crawl, or work at heights or around hazards. (Id.) He should also avoid concentrated exposure to extreme cold and extreme heat. (Id.) Gianforte testified that such an individual could work as a security monitor, information clerk, or security clerk. (Id. at 49.) The ALJ then asked for examples of unskilled positions that would fit the hypothetical, and Gianforte's response included phone order taker, order clerk, and auto locater. (Id.)

## D.   The ALJ's Decision

The ALJ concluded that Willis was not disabled under sections 216(i) and 223(d) of the Social Security Act prior to January 31, 2009, but became disabled on that date and has continued to be disabled through the date of her decision. (A.R. 20.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* § 404.1520(f),(g).

Here, the ALJ determined at steps one and two of the analysis that Willis has not engaged in SGA since September 20, 2005, and that his right hip and wrist fractures and the degenerative joint disease in his right ankle constitute severe impairments. (A.R. 21.) At step three the ALJ determined that since the onset date of disability, Willis's impairment or combination of impairments neither meets nor medically equals any of the listings in 20 C.F.R. 404, Subpart P, Appendix 1. (Id. at 22.) She considered Listings 1.06 and 1.07 which include hip and wrist fractures, but noted that those listings were inapplicable because Willis's fractures are clinically solid, he could ambulate effectively, and there was no evidence of continuing surgical management of his wrist toward restoration of functional use. (Id.) The ALJ also considered Listing 1.02 which includes major joint dysfunction, but found that Willis's ankle impairment did not meet the listing's requirements

because he did not have a listed gross anatomical deformity and could ambulate effectively. (Id.)

Proceeding to the next step of the analysis, the ALJ concluded that Willis has the RFC to perform sedentary work, but cannot climb ladders, ropes, or scaffolds, kneel, crouch, or crawl, or work at heights or around hazards. (Id. at 22.) The ALJ determined that he can occasionally stoop and climb ramps and stairs, that he should avoid concentrated exposure to extreme cold and heat, and that he should be limited to frequent fingering with his right non-dominant hand. (Id.) In explaining her decision, the ALJ noted that while Willis's medically determinable impairments could reasonably be expected to cause the alleged symptoms, she did not find Willis's statements concerning the intensity, persistence, and limiting effects of his symptoms fully credible "given inconsistencies in the record overall." (Id. at 23.)

Having concluded that Willis retained an RFC for sedentary work, the ALJ determined that he is unable to return to work as a truck driver because the job's demands exceed his RFC. The ALJ also determined that on January 31, 2009, Willis's age category changed to an individual "approaching advanced age" under the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (Id. at 28.) Based on her RFC determination, VE Gianforte's testimony, and the Medical-Vocational Guidelines, the ALJ decided that Willis was not disabled prior to January 31, 2009, but became disabled on that date and continued to be disabled through the date of her decision. (Id. at 31.)

## Analysis

In his motion for summary judgment, Willis challenges the ALJ's adverse credibility assessment regarding the extent of his wrist pain. (R. 17, Pl.'s Mem. at 6.) This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

Willis has a particularly high hurdle to overcome in challenging the ALJ's credibility assessment because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. This court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Willis "must do more than point to a different conclusion that the ALJ could have reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Put simply, this court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In either case, the ALJ must provide an explanation for her credibility assessment that is sufficient to give the reviewing court a fair sense of

how she weighed the claimant's testimony. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

An ALJ must follow a two-step process for evaluating symptoms such as pain. *See* SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms. *Id.* Second, if there is such an underlying physical or mental impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which the symptoms limit his ability to perform basic work activities. *Id.* at *3. If a claimant's statements about the intensity, persistence, or functional limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of his statements based on her consideration of the entire case record. *Id.*

An ALJ cannot discredit a claimant's testimony about his pain and limitations "solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted). In other words, an ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (citation omitted). SSR 96-7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms,

statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

Willis takes issue with three aspects of the ALJ's credibility finding relating to his wrist pain. He argues that the ALJ: (1) failed to provide specific examples of inconsistencies in the record; (2) drew unwarranted inferences from his limited care; and (3) erred by affording insufficient weight to his daily activities and work history. (R. 17, Pl.'s Mem. at 7, 9.) The Commissioner counters that the ALJ did in fact point to inconsistencies in the record to explain why she found Willis's allegations regarding his right wrist limitations incredible. (R. 26, Def.'s Mem. at 5-6.) According to the Commissioner, the ALJ properly considered Willis's treatment history, daily activities, work history, and other evidence in assessing his credibility. (Id. at 6-7.)

This court finds that the ALJ's analysis is not sufficiently supported by substantial evidence. Willis first contends that the ALJ failed to explain which inconsistencies in the record supported her decision to discredit his testimony about the intensity of his wrist pain. Although the ALJ cited to various medical reports in her analysis, it appears that she only considered those facts favoring a finding of non-disability and disregarded evidence pointing to a disability finding. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ wrote that Willis's wrist was "completely healed and in good position" according to Dr. Ortinau's notes from a

July 2006 visit.  (A.R. 26.)  She also pointed out that Willis reported "no problems with his wrist" during that visit and that Dr. Ortinau's subsequent notes did not mention any wrist problems.  (Id.)  But the ALJ did not explain how she weighed this evidence against Dr. Ezike's impression of "chronic right wrist pain" in March 2007, (id. at 498), or Dr. Norbury's July 2007 notes regarding "traumatic arthritis" in Willis's wrist, (id. at 502), which the ALJ relied on in her RFC determination, (id. at 22).  If evidence contradicts the ALJ's conclusions, the ALJ must confront that evidence and explain why it was rejected.  *Thomas v. Colvin,* 534 Fed. Appx. 546, 550 (7th Cir. 2013).  Here the ALJ did not address these details from Dr. Ezike's and Dr. Norbury's reports.

The ALJ did rely on Dr. Ezike's findings that Willis had slightly decreased grip strength, reported only "occasional" wrist pain, and could pick up a coin, grasp and manipulate objects normally, fully extend his hands, make fists, and appose his fingers.  (A.R. 26.)  But she did not discuss how these findings were inconsistent with Willis's testimony that his pain increases the more he uses his right hand, and that he has to stop using it after 30 minutes to an hour.  (Id. at 529.)  Willis could be capable of performing the short tasks Dr. Ezike described and yet still experience the pain and limitations he alleges.

Furthermore, although Dr. Ortinau's notes from July to December 2006 contain no mention of wrist pain, Willis could have started experiencing pain in the several months between his last visit to Dr. Ortinau and his consultative examinations in March and July 2007.  More than two years elapsed between

Willis's December 2006 appointment and his March 2009 hearing, a period during which Willis asserts he developed arthritis. (See id. at 543.) Dr. Ortinau's notes also end in December 2006, the time when Willis testified he lost the ability to pay for doctor visits and pain medication. (Id. at 527-28.) It is unclear whether the ALJ considered this testimony when she relied on the fact that Dr. Ortinau's notes after the July 2006 exam contain no mention of wrist pain. Although Willis's medical records for the five months after July 2006 do not mention wrist problems, naturally no "subsequent notes" would exist after Willis stopped seeing Dr. Ortinau in December 2006. Willis's pain also could have increased after December 2006 because he could no longer get prescription strength pain medication. Lack of medical evidence supporting the severity of a claimant's symptoms is insufficient, standing alone, to discredit his testimony. *Villano*, 556 F.3d at 562. If the ALJ finds it implausible that Willis began experiencing wrist pain between his last visit with Dr. Ortinau in December 2006 and his consultative exams in March and July 2007, then she should explain her reasons on remand.

Moreover, the ALJ mischaracterized Willis's testimony, finding inconsistency where none exists. She said Willis first testified that he "sometimes" has pain in his right wrist, but that he later "changed his testimony, indicating that he has pain all the time." (A.R. 26.) But Willis testified that he sometimes has "*shooting* pain" in his right wrist. (Id. at 529 (emphasis added).) His subsequent testimony that he experiences constant pain was therefore not inconsistent with his earlier testimony

because he might only experience *shooting* pain some of the time, but still feel some lesser level of pain the rest of the time.

The ALJ did reasonably conclude that Dr. Norbury's opinion said Willis should not finger constantly but contained no prohibition on frequent fingering. (Id. at 27.) While such evidence provides some support for the ALJ's credibility determination, this sound rationale is overshadowed by the ALJ's other errors. The ALJ's credibility decision is not required to be flawless, *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), but she must sufficiently explain why she discredited Willis's statements regarding the intensity, persistence, and limiting effects of his wrist pain. In view of the gaps in her discussion of the medical record and her mischaracterization of Willis's testimony, this court finds that the ALJ's reliance on "inconsistencies in the record" as a basis for her credibility determination lacks sufficient support.

Willis's second argument is that the ALJ's consideration of his "limited care" is contrary to SSA rulings and regulations and should not have been used as an element of credibility. (R. 17, Pl.'s Mem. at 7.) An ALJ should consider a claimant's reasons for failure to seek or pursue regular medical treatment before using lack of treatment to undermine the claimant's credibility. SSR 96-7p, 1996 WL 374186, at *7-8. "Good reasons" for lack of treatment include that a claimant's daily activities may be structured so as to minimize symptoms, or that he may be unable to afford treatment and may not have access to free or low-cost medical services. *See id.*; *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Willis testified that he used to

receive workers' compensation benefits to cover his medical treatment, but that those payments ceased after December 2006. (A.R. 527-28.) He explained that he is not seeing any doctors aside from Dr. Chung because he does not have insurance, and that he would visit a pain clinic if he did have coverage. (Id. 534-35.) He further testified that although he used to take Vicodin for his pain, he now only takes over-the-counter medications because he is unable to get prescription drugs. (Id. at 535.)

The ALJ said that she "[took] these factors into account" yet still weighed Willis's lack of treatment against him. (Id. at 27.) The ALJ's explanation for why she did so is insufficient. An ALJ's credibility finding must be grounded in the evidence and articulated in the determination or decision. *See* SSR 96-7p, 1996 WL 374186, at *4. Here the ALJ pointed to the fact that Willis only takes over-the-counter pain medications. (A.R. 27.) But using Willis's lack of access to prescription drugs to explain why she discredited his explanation for lack of treatment is circular. (Id.) She also appears to hold against Willis the fact that his pain is controlled when he "limits his standing and walking" and uses a shoe lift. (Id.) This is again circular because the ability to structure daily activities to minimize pain is a valid explanation for failure to pursue regular medical treatment. *See* SSR 96-7p, 1996 WL 374186, at *8. The ALJ then referred to Willis's testimony that he could "possibly" do seated work to discredit his explanation for not seeking treatment, (A.R. 27), but she failed to address his immediately subsequent testimony that his wrist pain might prevent him from

working even a seated job if it involved putting small parts together, (id. at 523). On remand, the ALJ should articulate supported reasons for making a negative inference based on Willis's lack of treatment if she adheres to her conclusion that his treatment record detracts from his credibility. The ALJ may also want to invite Willis to clarify what may be an inconsistency in his hearing testimony regarding his ability to secure prescription medication for his high blood pressure but not for his chronic pain.

Finally, Willis argues that the ALJ erred by affording less weight to Willis's daily activities and work history than to "objective" factors. (R. 17, Pl.'s Mem. at 9.) Specifically, Willis believes the ALJ failed to explain how his daily activities and work history "actually affected her reasoning." (Id.) An ALJ is required to explain the inconsistencies between a claimant's activities of daily living, his complaints of pain, and the medical evidence. SSR 96-7p, 1996 WL 374186, at *3; *see Villano*, 556 F.3d at 562. While here the ALJ adequately supported her determination that Willis could only do seated work based on his daily activities, she failed to explain how his activities affected her reasoning with regard to his ability to finger. (A.R. 27.) The ALJ merely mentioned that Willis described doing most activities with his left dominant hand, which she said "[was] considered," before concluding that "[t]o the extent the claimant's activities could be viewed as support for his allegations (such as limiting his right hand use) . . . other evidence is more probative (including the lack of treatment history, objective findings and opinions discussed earlier)." (Id.)

These vague statements do not provide the necessary analysis of Willis's right wrist symptoms. For one, as discussed above, the ALJ's analyses of Willis's treatment history and medical evidence were faulty. As for Willis's daily activities, the ALJ noted that he could drive, do light chores, shop, go to the post office, and eat out occasionally, but did not explain why these activities are inconsistent with Willis's claim that he cannot perform frequent fingering with his non-dominant right hand. (Id.) More specifically, she did not explain why such activities led her to believe that Willis could make more than occasional use of *both* his hands, not just his left. Nor did the ALJ address Willis's testimony that his pain increases the more he uses his right hand and wrist. (Id. at 529.)

Furthermore, the Seventh Circuit recently has criticized equating activities of daily living to employment, noting that "[t]he critical difference between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [he] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013). Regulations require consideration of the frequency and duration of symptoms and the measures the claimant uses to alleviate his symptoms. SSR 96-7p, 1996 WL 374186, at *3. The ALJ failed to meet these requirements here.

In sum, the court finds that the ALJ did not adequately articulate her reasons for discounting Willis's credibility. In some cases, the Seventh Circuit has affirmed the ALJ's decision despite the presence of flaws in reasoning when the

ALJ's other reasons are valid, *Halsell v. Astrue*, 357 F. Appx. 717, 722 (7th Cir. 2009) ("[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are" (emphasis in original)), or when the evidence supporting the ALJ's decision is overwhelming, *McKinzey v. Astrue*, 641 F.3d 884, 893-94 (7th Cir. 2011) ("Although we have noted some problems with the way the ALJ articulated her unfavorable determination . . . we have also concluded that remanding this case to the agency would serve no purpose in light of the overwhelming evidence supporting the ALJ's decision."). In this case, however, neither of those situations exists. The cumulative effect of the errors described above leave this court "without confidence that the ALJ's decision builds a 'logical bridge' between the evidence and . . . conclusion," *Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009), thus requiring remand.

## Conclusion

For the foregoing reasons, Willis's motion is granted to the extent that the case is remanded for further proceedings and the Commissioner's motion is denied.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**